FILED
DECEMBER 20, 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RAYMOND YEE, <br><br> Plaintiff, <br><br> vs. <br><br> UBS O'Connor, LLC and UBS Global Asset Management, <br><br> Defendants. | Case No. <br><br> JURY TRIAL DEMANDED <br><br> 07 C 7150 <br><br> JUDGE MAROVICH <br> MAGISTRATE JUDGE SCHENKIER |

# COMPLAINT

Plaintiff complains against Defendants as follows:

### Jurisdiction and venue

1. This Court has jurisdiction of this case pursuant to 29 U.S.C. § 626(c)(1), in that this is an action brought under the Age Discrimination in Employment Act of 1967, as amended.

2. Plaintiff has exhausted all administrative requirements to bring this lawsuit. Raymond Yee has filed a timely charge of discrimination with the United States Equal Employment Opportunity Commission, which cross-filed the charge with the Illinois Department of Human Rights. He has waited 60 days before filing this complaint, as required by 29 U.S.C. § 626(d).

3. This Court has venue under 28 U.S.C. § 1391 because a substantial part of the events or omissions that underlie this complaint took place here.

**Parties**

4. Plaintiff Raymond Yee is a former employee of defendants UBS O'Connor, LLC and UBS Global Asset Management.

5. Plaintiff brings this lawsuit pursuant to 29 U.S.C. § 626(b), *et seq*. and 29 U.S.C. § 216(b), *et seq*.

6. Defendants UBS O'Connor, LLC and UBS Global Asset Management (collectively "UBS") are investment banking and securities firms and global asset managers. They are engaged in an "industry affecting commerce" within the meaning of the ADEA.

**Claim for Relief**

7. Mr. Yee was hired by O'Connor & Associates in 1989 as a senior analyst.

8. In 1992, Mr. Yee was promoted to the position of Director/ Senior Analyst.

9. In around 1995, O'Connor & Associates was acquired by Swiss Bank Corporation, which subsequently merged with UBS.

10. UBS O'Connor LLC is a unit within the Alternative and Quantitative Investments Division within UBS Global Asset Management.

11. In 1997, Mr. Yee was promoted to the title of Executive Director.

12. Since 1999, Mr. Yee has been in charge of the health-care sector of the hedge fund portfolios operated within UBS O'Connor LLC.

13. During the course of his employment, in addition to earning these promotions, he also earned bonuses between $100,000 (plus $35,000 in warrants) and $2 million since 1999.

14. Mr. Yee was the oldest (D.O.B. June 10, 1952) portfolio manager in his group.

15. Mr. Yee was supervised by Kipp Schrage effective 1999 until his last day of employment.

16. For the past several years prior to his termination, UBS did not give Mr. Yee an annual appraisal, objective setting, or development, whereas younger managers were given appraisals, objective settings and development.

17. The UBS system contains appraisals for Mr. Yee for 2005 and 2006, which were only first provided to Mr. Yee in August 2007 after his termination.

18. UBS policy provides for annual salary reviews.

19. Mr. Yee was shown no annual salary reviews since 2001.

20. From around 1999 until his termination, Mr. Yee was excluded by Mr. Schrage from assignments and meetings which are viewed as important at UBS.

21. From around 1999 until his termination, Mr. Yee noticed that younger portfolio managers were given assignments to report to investors, meet with investors, interview job candidates and develop new business, while Mr. Schrage excluded Mr. Yee from these opportunities.

22. Mr. Schrage also took away Mr. Yee's business opportunities.

23. Mr. Schrage gave away Mr. Yee's specialty pharmaceutical area to Mr. Peisert without consultation.

24. Mr. Schrage also directed his subordinate to hire an analyst/portfolio manager for Europe while Mr. Yee was actively running a portfolio in that area; after failing to find a suitable candidate, Mr. Schrage directed the reassignment of the sector to a younger analyst, Daniel

Gottwald, who has since left the company.

25. Mr. Robert Apter was a younger portfolio manager who partnered with Mr. Yee in the health-care sector since 1999.

26. Mr. Yee and Mr. Apter held substantially the same position and accountability as they were partners in managing a portfolio in the health care sector.

27. Initially, Mr. Yee made more money, in base salary and bonuses, than Mr. Apter.

28. Over time, the salary differential reversed. Mr. Yee's relative compensation to Mr. Apter declined substantially over the 1999-2006 time period. Mr. Apter was given annual salary increases over the time period.

29. For 2006, Mr. Yee's incentive compensation was below that of Mr. Apter.

30. Mr. Yee was denied merit increases on the pretext that the bank does not allow them, while Mr. Apter continued to receive such raises.

31. Mr. Schrage also criticized and humiliated Mr. Yee in public.

32. Mr. Schrage criticized Mr. Yee for poor support of other businesses and poor P&L performances, even while other, younger managers were losing as much money or more. Mr. Schrage did not criticize Mr. Apter, even though he shared a portfolio with Mr. Yee.

33. Rather than speaking with Mr. Yee directly, Mr. Schrage refused to communicate with him and instead channeled issues and criticisms through Mr. Apter.

34. When Mr. Yee asked Mr. Schrage about this practice, he responded that he considered any communications to Mr. Apter to be a communication to Mr. Apter and Mr. Yee as a "team." Mr. Schrage never similarly cut Mr. Apter out of communications.

35. Mr. Schrage's demeaning behavior and refusal to communicate with Mr. Yee

adversely affected Mr. Yee's ability to continue to do an excellent job as a portfolio manager.

36. In mid 2006, during a weekly meeting, while Mr. Yee was answering Mr. Schrage's questions and criticism on the healthcare portfolio, Mr. Schrage lashed out and publicly criticized him. Mr. Schrage then openly initiated another conversation with Paul Mitchell, a younger analyst.

37. In January 2007, Mr. Schrage conducted an annual review with Mr. Apter and criticized him for being too positive on his 360-degree review of Mr. Yee.

38. In spring 2007, the portfolio that Mr. Apter and Mr. Yee jointly managed lost approximately $17 million, about 3% of the value of the portfolio, which is within the norm for variance for a hedge fund portfolio.

39. Shortly thereafter, the portfolio recouped approximately $3 million, and would have recouped most of the losses within the next few months if the portfolio was left intact.

40. The small percentage of loss in the fund that Mr. Yee and Mr. Apter managed was concentrated only in the last 16 months (2006 and 2007) and was an ordinary and short term variance.

41. In reviewing performance, such ordinary fluctuations would normally be compared to Mr. Yee's long track record of earning money for the fund.

42. Before noon on April 20, 2007, Mr. Schrage confronted Mr. Yee about the need to "do something," but did not confront Mr. Apter.

43. Mr. Schrage threatened Mr. Yee with probation (which is the first step toward termination) unless Mr. Yee agreed to accept a severance package, but emphasized that he would

5

recommend against probation because it is official and inflexible.

44. Mr. Schrage represented that it would be necessary for him to add another health care team.

45. Mr. Yee declined to accept the probation or severance package.

46. On May 11, 2007, the company sent a letter that Mr. Yee's final day of work would be July 31, 2007.

47. Mr. Yee attempted to continue to work, but was informed that he would not be allowed to return to work and that his personal belongings would be returned to him.

48. UBS instantly hired another healthcare analyst/portfolio manager, Chris Shibutani, who was fifteen years younger than Mr. Yee to replace him in the position.

49. Mr. Apter did not suffer any repercussions for the loss in the fund.

50. In being threatened with termination and probation, Mr. Yee was treated differently than other younger analysts who had similar dollar and percentage short term draw downs in the last three years, including Jason Randolph, Michael Braden and Paul Chambers.

51. A drop of 3% in any portfolio was a normal event. Normally, a supervisor would be helpful and supportive in addressing this kind of an issue in a portfolio. Instead, Mr. Schrage undermined Mr. Yee's ability to do a good job.

### **Prayer for relief**

WHEREFORE, plaintiff requests that this Court:

A. Upon the trial of this case by a jury, award each plaintiff his actual losses;

B. Award plaintiffs liquidated damages pursuant to 29 U.S.C. § 626(b);

  C. Award back pay and/or front pay as appropriate;

  D. Order appropriate adjustments to plaintiff's future entitlement to pension and similar benefits;

  E. Award plaintiff his reasonable attorney's fees and expenses; and

  F. Award plaintiff such other relief as the Court deems just.

          Respectfully Submitted,

          RAYMOND YEE
          Plaintiff


        By: __/s/ Paul W. Mollica_____
          Meites, Mulder, Mollica & Glink
          One of His Attorneys

7