## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

RAYMOND YEE, )
)
)
Plaintiff, )
) No. 07 C 7150
vs. ) Magistrate Judge Schenkier
)
)
UBS O'CONNOR, LLC and UBS GLOBAL )
ASSET MANAGEMENT, )
)
)
Defendants. )

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff, Raymond Yee, seeks to hold his former employer, UBS O'Connor, LLC and

UBS Global Asset Management (hereinafter collectively "UBS"), liable for age discrimination

pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* In a

one-count complaint, Mr. Yee alleges that UBS terminated his employment in violation of the

ADEA. UBS has filed a motion for summary judgment, pursuant to Federal Rule of Civil

Procedure 56. Mr. Yee has filed a motion to strike certain fact assertions offered by defendants

in support of that motion. After careful review of the parties' submissions, we grant in part and

deny in part the motion to strike (doc. # 55); and based on the material and genuinely disputed

facts, we find that UBS's summary judgment motion (doc. #52) must be denied.[2]

---

[1]On April 21, 2008, by consent of the parties and pursuant to 28 U.S.C. § 636(c), this case was assigned to this Court for all proceedings, including the entry of final judgment (doc.# 9, 14).

[2]For purposes of citation format, the following short forms will be used. For the Defendants' Local Rule 56.1 Statement of Material Facts, we refer to "DSOF." For the Plaintiff's Local Rule 56.1(b)(3) Response to Defendants' Rule 56.1 Statement of Material Facts, we refer to "Pl.'s Resp. DSOF." For Plaintiff's Local Rule 56.1(b)(3)(c)Statement of Additional Facts, we refer to "PSAF." And, for Defendants' Response to Plaintiff's Local Rule 56.1(b)(3)(c)Statement of Additional Facts, we refer to "Defs.' Resp. PSAF." References to the parties' briefs use the following short forms: Defendants' Memorandum In Support of Summary Judgment is referred to as "Defs.' Mem.";

## I.

As a preliminary matter, we consider Mr. Yee's motion to strike certain factual assertions made by UBS in its Local Rule 56.1 Statement of Material Facts in support of its motion for summary judgment. There are basically three categories of evidence Mr. Yee objects to in his motion to strike: (1) the "summary exhibits," (2) the emails, and (3) testimony related to unavailable or allegedly inadmissible documents.

As UBS correctly points out, Mr. Yee provides only general argument to support specific document objections in his motion to strike. Instead, he includes a chart to list specific evidentiary objections to multiple documents and deposition or affidavit excerpts contained in UBS's appendix of exhibits. UBS contends that such brevity violates Fed R Civ P. 7(b)(1)(B), which requires motions to state with specificity the basis for requested relief. Nonetheless, UBS addresses the specific objections. The Court will do the same. We address these three categories in turn.

## A.

UBS has submitted a set of exhibits that purport to compare Mr. Yee's Profit and Loss ("PnL") performance month-by-month and year-to-year with other portfolio managers within UBS's Global Fundamental Market Neutral Long/Short Strategy and Fund ("Strategy") for the period January 2004 through April 19, 2007 (Defs.' App., Tab 24). Mr. Yee moves to strike Tab 24 as inadmissible under Federal Rules of Evidence 803(6), 901(a), and 1006 (Pl.'s Mot. to Strike at 1). Specifically, Mr. Yee argues that Tab 24 should be stricken because: (1) it lacks foundation; (2) its underlying data was not made sufficiently available; and (3) its reliability is

---

Plaintiff's Response to Defendants' Memorandum In Support of Summary Judgment is referred to as "Pl.'s Resp.";
Defendants' Reply Memorandum In Support of Summary Judgment is referred to as "Defs.' Reply."

undermined by its amendment during discovery (*Id.* at 2-5). UBS contends that these assertions lack merit, and that Tab 24 is admissible as an authenticated business record pursuant to Rule 803(6) (Defs.' Resp. at 2-8).

For purposes of summary judgment, UBS agreed on the PnL numbers for 2006 and 2007 (PSAF 92 n.3). Thus, the information from Tab 24 is not material to the resolution of the summary judgment motion at issue. The Court therefore denies the motion to strike Tab 24 as moot.

### B.

The emails subject to the motion to strike are listed below in an excerpt from Mr. Yee's chart (Pl.'s Motion to Strike at 8-10). The Court has added a column explaining the rulings made on each separate objection.

| UBS Summary Judgment Exhibit | Paragraph in UBS's LR 56.1 Statement | Challenged Portion | Basis of Objection | Rulings |
|---|---|---|---|---|
| Tab 4, Yee Dep. Exs. 10/30/08 | 47 | Yee Ex. 11: Email by K. Schrage, 10/26/06 | Hearsay, FRE 801(c), 802; lack of foundation, FRE 901(a), 902(11). No foundation as business record under FRE 803(6). | **Denied:** Email is not hearsay under Rule 801(d)(2)(B) as statement adopted by party-opponent (Pl. Dep. at 191, Ex. 11). Foundation established by Schrage's testimony under FRE 901(b)(1). UBS can also lay foundation at trial as a business record under FRE 803(6). |

| UBS Summary Judgment Exhibit | Paragraph in UBS's LR 56.1 Statement | Challenged Portion | Basis of Objection | Rulings |
|---|---|---|---|---|
| Tab 4 (same as above) | 70 | Yee Ex. 21: Email by A. Rudin, 05/15/07 | Hearsay, FRE 801(c), 802; lack of foundation, FRE 901(a), 902(11). No foundation as business record under FRE 803 (6). | **Denied:** Mr. Yee admitted DSOF 70, and thus Mr. Yee waived any objections to the evidence cited to support this statement. |
| Tab 6, Yee Dep., 03/26/09 | N/A | Hildebrandt Ex. 3: Email by P. Hildebrandt, 08/06/07 | Hearsay, FRE 801(c), 802; lack of foundation, FRE901(a), 902(11). No foundation as business record, FRE 803(6). | **Denied as moot:** This email is not asserted by UBS in its LR 56.1 fact statement as support for summary judgment. |
| Tab 6 (same as above) | N/A | Ex. 3: Email by Ralph Segall, 08/09/07 | Hearsay, FRE 801(c), 802 (Segall portions); lack of foundation, FRE 901(a), 902(11). No foundation as business record , FRE 803(6). | **Denied as moot:** The objected to portions of the email are not asserted by UBS in its LR 56.1 fact statement as support for summary judgment. |
| Tab 6 (same as above) | 77 | Hildebrandt Ex. 2: Email by R. Yee, 08/03/07 | Attorney-Client privilege | **Denied:** on 03/04/09, the Court overruled the privileged claim. |
| Tab 12, Pl. Ex. 31 | 5 [sic] Cited Email is at 57 | Pl.'s Ex. 31, Email by K. Schrage, 04/19/07 | Hearsay, FRE 801(c), 802; lack of foundation, FRE 901(a), 902(11). No foundation as business record, FRE 803(6). | **Denied:** Email is not hearsay because it is not offered for the truth of the matter asserted. Foundation is established by Rudin's and Schrage's testimony under FRE 901(b)(1). Foundation as business record under FRE 803(6) can be established at trial. |

4

| UBS Summary Judgment Exhibit | Paragraph in UBS's LR 56.1 Statement | Challenged Portion | Basis of Objection | Rulings |
|---|---|---|---|---|
| Tab 14, Pl. Ex. 8 | 5 [sic]. Cited Email is at ¶ 55 | Pl's Ex. 8, Email by K. Schrage, 02/26/07 | Hearsay, FRE 801(c), 802 (Schrage portions); lack of foundation, FRE 901(a), 902(11). No foundation as business record, FRE 803(6). | **Denied:** Tab 14 is not hearsay under FRE 801(d)(2)(B) as statement adopted by party-opponent (Mr. Yee responds in cited email to statements denied in ¶ 55 as subject matter of Schrage email. Mr. Yee also admitted to subject matter of email in ¶ 55). Foundation under FRE 901(a) is established by Schrage's testimony under FRE 901(b)(2). Foundation as a business record under FRE 803(6) can be established at trial. |
| Tab 23, Schrage Aff. | 62 | Ex. 3, Email by K. Schrage, 04/20/07 | Hearsay, FRE 801(c), 802; lack of foundation, FRE 901(a), 902(11). No foundation as business record, FRE 803(6). | **Denied:** Foundation under FRE 901(a) established by personal knowledge of Schrage under FRE 901(b)(2). Foundation as business record under FRE 803(6) can be established at trial. |
| Tab 25, Appx. B | 76 | Email, 08/03/07 (Yee) | Hearsay, FRE 801(c), 802 (Rode portions). Lack of foundation, FRE 901(a), 902(11). No foundation as business record, FRE 803(6). | **Denied:** Email chain produced by plaintiff establishes foundation under FRE 901(a). Defendants offer the Rode portion of the email for the legitimate non-hearsay purpose of showing context for plaintiff's response. |

The motion to strike also identifies various excerpts of testimony that Mr. Yee claims are inadmissible. Mr. Yee's objections are listed below in table format, as laid out in Mr. Yee's motion. The Court has added a column with its rulings on each objection.

| UBS Summary Judgment Exhibit | Cited in UBS LR 56.1 Statement | Challenged Portion | Basis of Objection | Rulings |
|---|---|---|---|---|
| Tab 5, Yee Dep., 03/26/09 | 74 | Yee Dep. Tr. 10:15-11:7, 11:13-20; 24:12-23; 28:11-21 | Hearsay, FRE 801(c), 802 | **Denied:** Mr. Yee waived objections because he admits the facts asserted at DSOF 74 supported by Tab 6, specifically, Yee Dep. Tr. 10-11, 24 and 28. |
| Tab 8, Fitzpatrick Dep., 03/24/09 | 67 | Fitzpatrick Dep. Tr. 103:16-21 | Lack of personal knowledge, FRE 602. Hearsay, FRE 801(c), 802. | **Granted:** Ms. Fitzpatrick lacks personal knowledge as to whether Mr. Yee resigned, since she was not present at the meeting in question. |
| Tab 9, Hildebrandt Dep. | 75 | Hildebrandt Dep. Tr. at 40:16-41:15, 44:4-7 | Lack of personal knowledge, FRE 602. Hearsay, FRE 801(c), 802-putative offer and terms. | **Granted:** Mr. Hildebrandt's testimony establishes his personal knowledge of the specific matters for which his testimony is cited. |
| Tab 21 | 5 n.3 [sic] | Entire Affidavit | Hearsay, FRE 801(c), 802; lack of foundation, FRE 901(a). | **Granted:** It is not clear what the identified affidavit refers to and/or which paragraph of the LR 56.1 statement this evidence is intended to support. |
| Tab 22 | 5 | ¶¶ 2, 3: Rudin's description of UBS "Equal Employment policy," summary of contents of Employee Handbook | Hearsay, FRE 801(c), 802. | **Denied:** Ms. Rudin, as the HR Director, is charged with knowledge of such a policy and can testify regarding her knowledge of it. |

| UBS Summary Judgment Exhibit | Cited in UBS LR 56.1 Statement | Challenged Portion | Basis of Objection | Rulings |
|---|---|---|---|---|
| Tab 22 | 9, 13 | ¶ 4 and Exs. 1, 2: Entire paragraph and exhibits. | Hearsay, FRE 801(c), 802. No foundation for Exs. 1 and 2 as business records, particularly FRE 803(6). | **Denied:** Exs. 1 and 2 are not hearsay under the business records exception of FRE 803(6). Ms. Rudin, as HR Director, has personal knowledge of the job descriptions of UBS employees; the document identifying these duties is attached. UBS can lay foundation at trial as a business record. |

## II.

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law of the claims at issue determines which facts are material. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The party seeking summary judgment bears the burden of establishing that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment will be denied where the nonmoving party identifies material and genuinely disputed facts on all elements of the claim

asserted. *Celotex*, 477 U.S. at 323-24. If there is no triable issue of fact on even one essential element of the nonmoving party's case, summary judgment is appropriate. *Id.* In ruling on a summary judgment motion, the court must construe all facts in a light most favorable to the nonmoving party, drawing all legitimate inferences and resolving all doubts in favor of that party. *Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006).

## III.

Given these standards, we review the evidence submitted by the parties that is material to the age discrimination claim in this case. We identify the material facts that are genuinely disputed, as well as those without genuine dispute.[3]

### A.

We begin by identifying the defendants and the profit and loss ("PnL") platform upon which the defendants run their business.

### 1.

In 1992 O'Connor & Associates ("O'Connor"), a finance services firm that managed funds for clients (*Id.* ¶ 6), was acquired by Swiss Bank Corporation ("SBC") (*Id.,* ¶ 9). In 1998, SBC merged with Union Bank of Switzerland ("UBS"), resulting in a company called "UBS O'Connor LLC" (*Id.,* ¶¶ 9, 10). At all relevant times, UBS O'Connor LLC has operated as a wealth management, investment banking and securities firm (DSOF 2). UBS O'Connor LLC is an alternative investments provider within the Alternative and Quantitative Investments ("AQ") platform of UBS Global Asset Management (*i.e.,* "GLAM") (Answer ¶ 10; DSOF 2). UBS

---

[3]Where a fact has been disputed, but the dispute is immaterial or not genuine, that, too, is noted. For example, disputes that are not genuine include those where the party denies the asserted statement without an evidentiary basis for the denial or denies only part of the assertion without comment or citation controverting the rest. In these instances, the assertion will be deemed admitted if it is supported by the evidence in the record.

O'Connor LLC is one unit or division of GLAM (Answer ¶ 10); and GLAM is one division of UBS (DSOF 2). GLAM provides various investment solutions to private clients, financial intermediaries and institutional investors (DSOF 2; Answer ¶ 10). Collectively, GLAM and UBS O'Connor LLC are part of "UBS AG" (Def.'s Tab 22, Rudin Aff. ¶ 1). Both entities are named defendants in this case; thus, the Court will hereinafter refer to UBS O'Connor LLC and GLAM collectively as "UBS" (Defs.' Mem. at 1).

Among other investment strategies, UBS O'Connor LLC operates the Global Fundamental Market Neutral Long/Short Strategy and Fund (the "Strategy") (DSOF 2(a)).[4] The Strategy is comprised of six sectors: energy, financial, durables, consumer, telecom/media/technology and health care (DSOF 3).[5] Each of these sectors is managed by a Strategy Analyst/Portfolio Manager and a Senior Trader (Id. 3), who work together as a "team" and as "co-portfolio managers" (PSAF 111; Defs.' Resp. PSAF 111) (citing UBS's 2007 marketing materials at Pl.'s Dep. Exs., Tab 14, Ex. 51)).

Each Strategy Analyst/Portfolio Manager invests hundreds of millions of dollars in UBS investor funds (DSOF 3). Investors in the Strategy include institutions and private individuals (Id. 3).

**2.**

At UBS, the primary focus of an analyst be to make money through investment decisions (DSOF 20). Profitability is measured by PnL (the profits and losses record), which is the

---

[4]Defendants' Rule 56.1 Statement contains a typographical error in the numbered paragraphs. There are two number "3" paragraphs. Consequently, we will refer to the first number "3" paragraph as number "2(a)" and identify the remaining paragraphs as numbered.

[5]Mr. Yee denies the assertions made in DSOF 3, but this denial is not supported by citations to the evidentiary record except with respect to the fifth and last sentence of DSOF 3, which is not material. Thus, sentences one through four are admitted as undisputed.

ultimate measure of an analyst's investment performance (DSOF 20). PnL data is derived directly from the daily trades, and it is available both in real time and historically to every analyst in Strategy. At UBS, analysts can readily access and view PnL data for their own or any analyst's portfolio(s) (DSOF 22). Although analysts may experience short-term losses in their portfolios, they are expected to achieve overall positive returns (*Id.*). An analyst who is not making enough money through his/her investment decisions, or who is losing money, is considered to be underperforming (DSOF 21).

Traders, as well as analysts, "bear at least some accountability for PnL performance"; PnL thus is a factor in evaluating a trader's performance (PSAF 112). According to UBS, the trader's accountability is not "equal" to that of the analyst, except with regard to options, where the trader has full responsibility (Defs.' Resp. PSAF 112), because the analyst focuses on one portfolio while the trader is assigned to work with a variety of analysts on different portfolios (Defs.' Resp. PSAF 111). Nonetheless, UBS marketing materials from 2007 refer to traders and analysts as a "team" and as "co-portfolio managers" (PSAF 111). The literature also states that the "most important characteristic of our process is the healthy debate between industry traders and analysts, who each bring their own perspective to trade ideas" (Defs.' Resp. PSAF 111). The materials further state that "[t]raders and analysts must both contribute to their industry's trading profitability" (Defs.' Resp. PSAF 111).[6]

---

[6]The parties dispute the degree to which Mr. Schrage, the Managing Director of Strategy, considered the Senior Analyst and Senior Trader on any given portfolio to be a "team" (PSAF 112-113; Defs.' Resp. PSAF 112-113). Although the marketing documents referenced by the parties are not genuinely disputed, the parties genuinely dispute how Mr. Schrage applied the "team concept" referred to in those materials to Mr. Yee and Mr. Apter, the trader who worked with Mr. Yee.

Depending on the extent and duration of under performance, an analyst may be placed on probation or a performance improvement plan ("PIP")[7]; or, an analyst might have the size of the portfolio he or she manages decreased, *i.e.,* reducing assets under management (DSOF 21). UBS might also hire an additional analyst in that investment sector and/or terminate the analyst (*Id.*). UBS does not have a formal policy or procedure for implementing performance improvement plans or for placing underperforming employees on probation through the time of plaintiff's employment (DSOF 30). However, UBS managers utilize PIPs and probation as a practice in situations where they believe that an individual's performance could improve if presented with specific objectives and a deadline for meeting them (*Id.*).

For example, prior to their terminations for poor performance, Mr. Schrage put the following individuals on PIPs and/or probation: Robert Piton, age 31 at termination in 2007; and Christopher Recker, age 36 at termination in 2007 (DSOF 29). In addition, there is evidence that Mr. Schrage approved or recommended termination without a PIP for others based on unsatisfactory PnL performance.    Specifically, Mr. Schrage approved or recommended termination of the following analysts based on unsatisfactory PnL performance for either portfolio losses or a record of low and unsatisfactory positive returns: Joel Gechter, age 36 at termination in 2002; Jeff Kramer, age 39 at termination in 2002; Phillip Lorenz, age 37 at termination in 2002; Daniel Peisert, age 30 at termination in 2005; Robert Piton, age 31 at termination in 2007; Christopher Recker, age 37 at termination in 2007; Frederick Schultz, age 41 at termination in 2007; and Matt Siler, age 32 at termination in 2008 (DSOF 29).

[7]In UBS's Amended Response to 2d Set of Interrogatories, No. 3, UBS states: "UBS does not have a formal performance improvement plan. Mr. Schrage, however, has placed certain individuals on probation status/performance improvement tracks" (Pl.'s Appx. 432, cited in PSAF 109).

**B.**

Next, we identify the individuals who are relevant to Mr. Yee's ADEA claim and summarize their employment history with UBS.

**1.**

In 1989, at the age of 37, Raymond Yee (date of birth: 06/10/52) began his employment with O'Connor & Associates as a Senior Analyst (Complaint ¶ 14). In 1992 O'Connor promoted Mr. Yee to the position of Director/Senior Analyst (*Id.* ¶ 8). In 1997 O'Connor promoted Mr. Yee to Executive Director (*Id.*, ¶ 11). By 2000, after SBC acquired O'Connor and merged with UBS, Mr. Yee's position with UBS was Executive Director in charge of investments made in the health care sector (*Id.*, ¶¶ 11-12).[8] The health care sector was part of Strategy. In 2007, Mr. Yee was the oldest analyst working in Strategy (*Id.* ¶¶ 14; PSAF 81).

As the Senior Analyst/Portfolio Manager for the health care sector in Strategy, Mr. Yee's primary tasks were to conduct research into the health care sector and manage the equity side of the Fundamental Long/Short book (PSAF 83). UBS has submitted the job description for a Senior Portfolio Manager to establish the scope of Mr. Yee's job duties. Although this description is derived from the GLAM database for "Product Design and Management," rather than UBS O'Connor's database for Strategy, the UBS Human Resources Director has verified that this job description is applicable to all senior portfolio managers within UBS and applied to Mr. Yee at all relevant times (Defs.' Tab 22, Rudin Aff. 4).

---

[8]UBS did not include the "Executive Director" title in its LR 56.1 Statement. However, Mr. Yee asserts that he held this title, and Ms. Rudin, the Executive Director of Human Resources for GLAM, confirmed this title in her affidavit (Def.'s Tab 22, Rudin Aff. ¶ 5). The parties agree that Mr. Yee performed as a Senior Analyst/Portfolio Manager for Strategy (DSOF 8).

The job description for Senior Portfolio Manager states that an individual in that position is responsible for establishing "investment criteria, including guidelines for diversification, risk/return parameters and investment structure" (DSOF 9, citing Defs.' Tab 22). The description further states that a senior portfolio manager "has the final decision making authority" regarding how any transactions may complement or hinder his/her portfolio's objectives and is "fully responsible for the construction and management" of his/her investment portfolio (*Id.*).

Mr. Yee spent "five to eight hours a day or more" doing research on healthcare companies, so that he could be "an expert of the industry and the companies that [he] follow[ed]" (DSOF 10).[9] He reviewed numerous industry periodicals and publications, met with doctors and company managers and attended court hearings in notable cases (*Id.*). He also spent approximately 40 percent of his time out of the office traveling, both domestically and abroad, to attend various medical conferences and meetings (DSOF 10).[10]

Mr. Yee was, indeed, considered an expert in his field. In Mr. Yee's final review for the year 2006, his supervisor described him as "very knowledgeable and experienced in the sector" (Defs.' Supp. App., Tab 29, Defs.' App. 21).[11] Mr. Yee was further described as one who had "the respect of company management and peer analysts," because of his "indepth [sic] knowledge of the news and catalysts in his space" (*Id.*).

---

[9] For the years 2001-2007, Mr. Yee's subscriptions to various research publications cost UBS $59,309.40 (DSOF 11).

[10] For 2003-2007, Mr. Yee's travel expenses cost UBS $138,681.96 (DSOF 11).

[11] Although this fact was not asserted by the parties in the Rule 56.1 Statements, Mr. Yee's 2006 performance review was submitted into evidence, and its' authenticity is undisputed (*see* Defs.' Supp. Appx. 21, Tab 29).

**2.**

In 1990, at the age of 23, Robert Apter (date of birth: 03/24/67) began his employment with UBS O'Connor (DSOF 12). From 1999 through all relevant times in this case, Mr. Apter was a Senior Trader for Strategy (DSOF 12).

The job description for a Senior Trader states that the purpose of this job is to effectively calculate and execute necessary transactions within client guidelines (DSOF 13). But, the parties genuinely dispute whether Mr. Apter's "primary tasks" were to "survey the market for the best prices for health care investments"; "stay educated about the health care sector"; "manage the options side of the Fundamental Long/Short book"; and "hedge all of the Fundamental Long/Short portfolio" (*compare* PSAF 83 *with* Defs.' Resp. PSAF 83). The parties agree that Mr. Apter spent 50 percent of his work time trading for Mr. Yee on the healthcare portfolio in Strategy (DSOF 14). The remaining 50 percent of his work time was divided between trading for another analyst in the insurance sector (35 percent), as well as managing his own options trading portfolio; trading options to hedge the entire Strategy; and managing Strategy's electronic platform (15 percent) (DSOF 14, 15). The parties further agree that Mr. Apter spent minimal time doing research or traveling (DSOF 16).

**3.**

In 1983, at the age of 23, Kipp Schrage (date of birth: 03/03/60) began his employment with UBS (DSOF 3). From 1998 through all relevant times in this case, Mr. Schrage acted as the Managing Director for Strategy, and was Mr. Yee's direct supervisor (DSOF 3; PSAF 81-82; Complaint ¶ 15). Mr. Schrage was also the direct supervisor for Mr. Apter at all relevant times (PSAF 82). Mr. Schrage reported directly to Dawn Fitzpatrick in 2006 and 2007 (DSOF 4).

14

In 1992, Dawn Fitzpatrick began her employment with UBS O'Connor in the position of "trading assistant," namely, a clerk on the exchange floor (Defs.' Tab 8, Fitzpatrick Dep. 9).[12] Ms. Fitzpatrick testified that she was offered her job about the same time SBC bought O'Connor, but she did not begin her job until the UBS deal was struck (*Id.*). In 2002 she moved into management after time spent as a trader (*Id.* at 10). In 2006 George Locasto, her boss, began to train her for senior management in the "front office" (*Id.*, Dep. 7). This senior position required "day to day portfolio management" and management of "personnel issues" (*Id.* at 8). In October 2007, Ms. Fitzpatrick became the Interim Deputy Global Head of UBS O'Connor (Defs.' Tab 8, Fitzpatrick Dep. 6); in 2009, she became the official Deputy Global Head of UBS O'Connor (*Id.*, Dep. 5-6).[13]

As Mr. Schrage's supervisor, Ms. Fitzpatrick approved decisions by Mr. Schrage to terminate analysts. She also discussed performance issues involving analysts or traders with Mr. Schrage, including counseling, probations, PIPs, decreasing portfolio size, hiring additional employees, and terminating the employee (DSOF 21).[14]

---

[12]Although the parties did not assert this fact as material and without genuine dispute, we deem it admitted, because Ms. Fitzpatrick's sworn testimony is not controverted by other asserted evidence.

[13]The parties do not offer evidence regarding Ms. Fitzpatrick's age.

[14]The parties dispute whether Mr. Schrage sought approval for all hiring and termination decisions pertaining to Strategy with Ms. Fitzpatrick before acting (*compare* DSOF 4 ("Schrage has discussed with and obtained Fitzpatrick's approval for all hiring and termination decisions pertaining to the Strategy") *with* Pl.'s Resp. to DSOF 4 (Schrage testified that he possessed authority to fire an analyst, with consultation from Human Resources Director Angela Rudin; and, "[w]hen Schrage made the final decision to hire Chris Shibutani in 2007, neither he nor Fitzpatrick could specifically recall her having been involved . . . on the decision")).

In April 2007, Angela Rudin was the Executive Director of Human Resources for GLAM (DSOF 57). At that time, she had held this position for only one month (Pl.'s Dep. Ex. 35, Rudin Dep. at 5).[15] The parties do not offer any Rule 56.1 assertions regarding her age, length of employment or direct report with UBS; there are also no Rule 56.1 assertions regarding her authority to hire, fire or take remedial action with respect to employees, *i.e.*, placement on probation, a PIP, severance or a leave of absence. There are, however, assertions made regarding the role she played in Mr. Yee's employment at UBS, which we discuss below.

## C.

Having identified the relevant players, the Court will now turn to evidence offered by Mr. Yee to show age discrimination. Mr. Yee claims that he was subject to age discrimination by Mr. Schrage and no one else at UBS (including Ms. Fitzpatrick) (DSOF 32). We begin with the facts related to Mr. Yee's compensation and performance reviews, as well as his PnL performance in 2006 and 2007. These facts are relevant to the second element of Mr. Yee's *prima facie* case on the issue of whether he was meeting UBS's legitimate expectations.

## 1.

Despite Mr. Yee's assertions related to conflict between Mr. Schrage and himself, Mr. Yee's compensation record and annual performance reviews paint a balanced picture of their business relationship. With respect to compensation, *i.e.*, base salary plus bonuses, Mr. Schrage

---

[15]Again, although neither party asserts this fact as material and without dispute, we find no evidence in the record controverting this sworn testimony; thus, we admit it for purposes of background information.

submitted an affidavit which stated that he approved the following base salary and bonus compensation for Mr. Yee for his work performance from the years 1998-2006:

| Year | Base Salary | Bonus |
|------|-------------|-------------|
| 2006 | $150,000 | $150,000 |
| 2005 | $150,000 | $250,000 |
| 2004 | $150,000 | $400,000 |
| 2003 | $150,000 | $150,000 |
| 2002 | $150,000 | $150,000 |
| 2001 | $150,000 | $450,000 |
| 2000 | $140,000 | $2,000,000 |
| 1999 | $135,000 | $1,200,000 |
| 1998 | $125,000 | $475,000 |

(Defs.' Tab 23, Schrage Aff. ¶ 9).

Mr. Yee's personnel file and performance evaluations also generally reflect that, through the end of 2006, he was meeting the expectations of Mr. Schrage and, thus, UBS. Mr. Yee has submitted his annual Performance Management and Measurement ("PMM") reports from the years 2003, 2004, 2005 and 2006, identified as "Feedback Reports" in deposition exhibits (Pl.'s Dep. Exs. Tabs 2, 5, 6). The PMMs use letter and number ratings to signify certain performance levels. Although the older PMM feedback reports and PMM marketing materials do not define these numbers and letters, in a 1998 PMM by Mr. Schrage for Mr. Yee, the ratings are defined as follows:

17

| Contribution | Competency |
|---|---|
| 1=Far Exceeded | A=Transfers Competency |
| 2=Exceeded | B=Leverages Competency |
| 3=Fully Met | C=Demonstrates Competency |
| 4=Partially Met | D=Competency to be Developed |
| 5=Not Met | E=Competency not Demonstrated |

(Pl.'s Tab 10, App. 110).

In the PMMs for the years 2003-06, Mr. Yee did not receive less than an *overall* contribution rating of "3" or "fully met" profile, or a competency rating less than "C" (PSAF 84). In 2003, Mr. Yee received an overall contribution rating of "3" and an overall competency rating of "C" (Pl.'s Dep. Exs., Tab 6, App. 22-23); his bonus for 2003 was $150,000 (Defs.' Tab 23, Schrage Aff. ¶ 9). In 2004 Mr. Yee received a contribution rating of "3" and a competency rating of "B" (Pl.'s Dep. Exs., Tab 6, App. 20-21); his bonus for 2004 was $400,000 (Defs.' Tab 23, Schrage Aff. ¶ 9). In 2005 and 2006, Mr. Yee received an overall contribution rating of "3" and a competency rating of "C" (Pl.'s Dep. Exs., Tab 2, App. 10; Tab 5, App. 16); his bonus for 2005 was $250,000, and his bonus for 2006 was $150,000 (Defs.' Tab 23, Schrage Aff. ¶ 9). In all years noted, Mr. Yee's base salary was $150,000 (*Id.*).

In ratings for individual areas of competency and contribution, however, Mr. Yee's PMMs from 2005 and 2006 reflect declining performance with respect to PnL. For example, in Mr. Yee's PMM from 2005, Mr. Schrage describes his profitability performance as "disappointing" and "[t]otal assets under management" as "dangerously low relative to most other analyst/trader teams" (Def.'s Supp. App., Tab 29, App. 21). Individual ratings given by Mr. Schrage for 2005 include two ratings of "4" and two ratings of "3" (*Id.* at App. 19-20).

These ratings signify that Mr. Yee only "partially met" expectations in half of his individual performance markers for 2005. Specific goals and objectives for improving performance were noted both with respect to PnL and leadership.

Mr. Yee's PMM from 2006 reflects continued decline in his rated performance. In this PMM, Mr. Schrage describes Mr. Yee's portfolio's PnL performance for that year as a "loser" (Defs.' Supp. App., Tab 30, App. 25). Mr. Schrage's notes state: "PnL performance. Good back half of 2006 on smaller book, but the bottom-line, first half pnl makes 2006 a loser. Given the past few years performance, 2007 is an important year to get back on track regarding profitability more in line with the other sectors" (*Id.*). In the 2006 PMM, although Mr. Yee again received an overall rating of "3," in three out of seven individual benchmarks, Mr. Schrage gave him a rating of "4" or "partially met" expectations. Again, specific goals and objectives related to PnL were noted.

In 2006, Mr. Yee received a bonus of $150,000 (DSOF 53). In early 2007, Mr. Yee had a one-on-one meeting with Mr. Schrage to discuss his compensation and bonus of $150,00 for 2006 (DSOF 53). In his deposition, Mr. Yee testified that he understood that he received a low bonus because he "lost money in 2006" (DSOF 53). In fact, Mr. Yee admits that, in a conversation with Mr. Schrage about this bonus in early 2007, he referred to his 2006 bonus as "charity money" and a "nice courtesy" (DSOF 53). Mr. Yee did not initiate conversation about the 2006 PMM at this meeting, but he knew that it had been issued and was available online. Mr. Yee testified that he "didn't make an attempt to go and seek it out," even though he knew

19

how to access it online, because "bonuses [had] already be[en] doled out" and the 2006 PMM was "water under the bridge" (Defs.' Resp. PSAF 86).[16]

Mr. Yee testified that he kept silent because he believed, among other things, that he would be subject to retaliation (DSOF 7).

**2.**

Starting in approximately 2006, Ms. Fitzpatrick began to discuss the problem of PnL in the healthcare portfolio with Mr. Schrage (DSOF 48). Ms. Fitzpatrick initiated these discussions (DSOF 48). She told Mr. Schrage to watch Mr. Yee's performance and suggested coming up with a strategy for improvement, including, potentially, a PIP (DSOF 48). Although there is no evidence that Mr. Yee was aware of Ms. Fitzgerald's concerns, there is evidence that Mr. Yee was concerned about his job at this time, expressing these concerns about "half a dozen" times to Mr. Apter in 2006 and 2007 (DSOF 49).

**3.**

Subsequently, despite what Mr. Schrage described as a "strong comeback" for PnL in the healthcare sector in the second half of 2006[17] (Pl.'s Dep. Exs., Tab 2, App. 12), Mr. Schrage told Mr. Yee that he could be dismissed for overall "poor PnL" performances in comparison to other sectors of Strategy (DSOF 50). Mr. Yee responded by defending his overall PnL record. He told Mr. Schrage that, if given some time, he believed he could turn his PnL record around (DSOF 51). This conversation led to an argument "that ended only when Mr. Apter was called into the

---

[16]These facts have been asserted by UBS as reasons for denying Mr. Yee's fact assertions in PSAF 86. Because the assertions are based on Mr. Yee's sworn testimony and are uncontroverted, we deem these facts admitted.

[17]Mr. Yee testified that this meeting took place in November 2006, but UBS only admits it occurred in late 2006 (DSOF 50; PSAF 89).

room" to offer his views regarding PnL in the back half of 2006 (DSOF 51; PSAF 89; Defs.' Resp. PSAF 89). Mr. Schrage ended the meeting by telling both Mr. Yee and Mr. Apter that their performance had to improve, and they had to "make money" (DSOF 51).

**4.**

The healthcare portfolio's PnL continued to deteriorate in 2007 (DSOF 54).[18] Between January and February 2007, the healthcare portfolio lost about $13 million (DSOF 54; PSAF 93 n.3). Mr. Yee and Mr. Apter were aware of this fact because they had multiple conversations about declining PnL (DSOF 52).

On February 26, 2007, Mr. Schrage sent Mr. Yee and Mr. Apter an email noting the losses. He asked them to reduce the portfolio's investment assets and suggested they hire an additional analyst for the healthcare portfolio to improve performance for UBS investors (DSOF 55). Mr. Yee responded by admitting that the portfolio had taken a "significant hit in a short period of time," but he questioned the need for such action, and he asked Mr. Schrage for more time to begin making money (*Id.*).

Mr. Schrage gave Mr. Yee more time to begin making money (DSOF 56). Although the parties dispute whether Mr. Schrage "suggested" or "directed" Mr. Yee and Mr. Apter to "cut the book size, *i.e.,* to reduce assets by selling off investments (*compare* DSOF 56 *with* Pl.'s Resp. DSOF 56), whatever was said, Mr. Yee and Mr. Apter did exactly that (PSAF 93). The healthcare portfolio, however, continued to incur significant losses; and over the next eight

<hr>

[21]Although Mr. Yee denies DSOF 54 in his Rule 56.1 Response, his denial does not apply to this assertion; and the citation to the record he uses to controvert the assertion does not either. We therefore deem this assertion admitted based on his LR 56.1 Response.

weeks, by mid-April 2007, the healthcare portfolio lost another $4.3 million, bringing the total loss from January to April 19, 2007, to just under $17 million (DSOF 56).

On Thursday, April 19, 2007, Mr. Schrage decided that he could not wait any longer to address the increasing and substantial investment losses in the healthcare portfolio. To this end, Mr. Schrage sent an email to Ms. Rudin, stating: "Angela, can we touch base tomorrow. There are developments which I need to discuss with you – specifically Healthcare pnl performance has not improved in 2007" (DSOF 57).

### D.

We now turn to the events of April 20, 2007. These events yield a number of material and genuine disputes related to whether Mr. Yee suffered an adverse employment action, the third element of Mr. Yee's *prima facie* case.

On the morning of April 20, 2007, Mr. Schrage met with Ms. Rudin for an "HR Update" marked on their calendars for 9:00 a.m. (PSAF 95; Defs.' Reply PSAF 95). Mr. Yee testified that he saw them talking when he walked by Mr. Schrage's office (PSAF 95).

Around 10:55 a.m., Mr. Schrage called Mr. Yee and asked to meet him in Mr. Yee's office (DSOF 58; PSAF 96; Defs.' Resp. PSAF 96).[19] The topic of the conversation between Mr. Schrage and Mr. Yee is not disputed. Both parties acknowledge that Mr. Schrage and Mr. Yee determined and discussed that they had reached an impasse over what to do about the healthcare portfolio's declining PnL (DSOF 60), as well as Mr. Yee's performance related to that PnL. Mr. Schrage told Mr. Yee that he had to do "something" for the investors (PSAF 96),

---

[19]The order of these meetings is genuinely disputed but it is not material. For example, Mr. Yee claims that he saw Mr. Schrage meeting separately with Ms. Rudin after their 10:55 a.m. meeting. UBS contends that Mr. Schrage met with Ms. Rudin prior to the meeting with Mr. Yee.

so they discussed what, if any, options Mr. Yee had going forward with respect to his employment within Strategy under Mr. Schrage (DSOF 58, 59). There is no dispute that Mr. Schrage offered Mr. Yee "probation," although he cautioned that probation would be "official and messy" (PSAF 96).[20] There is also no dispute that Mr. Schrage offered Mr. Yee a severance plan, which included a favorable recommendation based on Mr. Yee's competency or knowledge of the industry (PSAF 96).[21]

The parties dispute whether Mr. Schrage offered Mr. Yee a PIP at this meeting (*compare* DSOF 58 *with* Pl.'s Resp. DSOF 58). UBS does not assert that Mr. Schrage ever said the words "performance improvement plan" to describe the probation option that he was giving Mr. Yee (DSOF 58). Instead, UBS claims that Mr. Schrage's offer of "probation" was the equivalent of offering Mr. Yee a "performance improvement plan" (Defs.' Resp. PSAF 110). UBS contends that Mr. Yee understood this point because he verbally refused to accept this option in his meeting with Mr. Schrage (*compare* DSOF 61 *with* Pl.'s Resp. DSOF 61). The parties' dispute about whether Mr. Schrage offered Mr. Yee a PIP on April 20, 2007 is not material since the parties agree that Mr. Schrage offered Mr. Yee probation (*see, e.g.,* DSOF 58; Pl.'s Resp. DSOF 64). As previously stated, UBS did not have a formal PIP policy; and, it equated probation with performance improvement plans.

---

[20]The offer of probation carried with it an offer to add another analyst to help manage the health care portfolio and to cut book size. Mr. Yee does not contest this fact (*compare:* DSOF 58 *with* Pl.'s Resp. DSOF 58).

[21]Mr. Yee claims that Mr. Schrage unconditionally offered a twelve month severance with full pay, but UBS asserts that this offer was conditional. The dispute is not material because Mr. Yee never accepted severance as an option on April 20, 2007.

23

Mr. Yee admits he was "upset" by the conversation with Mr. Schrage on the morning of April 20, 2007, because he "disagreed both with Schrage's assessment of the healthcare portfolio's PnL position and with the options offered to him" (DSOF 60-61). It is undisputed that, ultimately, Mr. Yee responded by asking for the "opportunity to explore" whether he could work in another area of UBS for someone other than Mr. Schrage "before accepting any final action" (PSAF 96).

Mr. Schrage was open to Mr. Yee's suggestion (DSOF 61). He agreed to meet with Ms. Rudin, the Human Resources Director for UBS to discuss the matter. The meeting between Mr. Schrage and Mr. Yee adjourned around noon (PSAF 96). Later that day, Mr. Schrage sent a chat email to Mr. Yee stating that Ms. Rudin was available to talk; and an afternoon meeting was held in Ms. Rudin's office on April 20, 2007, with Mr. Schrage and Mr. Yee present, to discuss Mr. Yee's employment (DSOF 63; Pl.'s Resp. to DSOF 63; PSAF 96-97).

The parties agree that, during the meeting with Ms. Rudin there were loud and angry words between Mr. Yee and Mr. Schrage (DSOF 63). For his part, Mr. Yee agrees that he defended his PnL record, disagreed with Mr. Schrage's management style, and stated that he did not think he was being treated fairly as compared to Mr. Apter (DSOF 63). There are no assertions regarding a response by Ms. Rudin or Mr. Schrage related to Mr. Apter at this meeting.

What the parties said about to Mr. Yee's future employment with UBS, however, is largely disputed. UBS contends that Mr. Yee refused to go on a PIP, and refused to agree to the addition of another analyst to the portfolio (DSOF 64). Mr. Yee contends that he did not "refuse" any options (Pl.'s Resp. DSOF 64). Instead, Mr. Yee says that he "expressed a

24

preference for exploring other options within the UBS organization" rather than accepting probation or severance (PSAF 97).

UBS also contends that Mr. Yee unequivocally stated that he could no longer work for Mr. Schrage in Strategy (DSOF 65); and, by this statement, both Ms. Rudin and Mr. Schrage understood Mr. Yee to have effectively resigned his position within the Strategy (DSOF 65). Mr. Yee flatly denies that he resigned his position (Pl.'s Resp. DSOF 65); and he flatly denies that he stated a refusal to work with Mr. Schrage (*Id.*). Instead, Mr. Yee asserts that he stated a "preference" that he no longer work with Mr. Schrage (Pls.' Resp. DSOF 65).

It is undisputed that Ms. Rudin's meeting notes do not include any reference to Mr. Yee resigning his position (Pl.'s Resp. DSOF 67). Similarly, Mr. Yee does not have any contemporaneous notes or emails describing what was said in the April 20, 2007 meeting. Thus, on the question of whether Mr. Yee refused to work with Mr. Schrage, the parties' testimony presents a swearing contest.

The parties agree that, during this meeting, Mr. Yee asked Ms. Rudin and Mr. Schrage whether they were aware that he would be 55 years old in June 2007, but both of them denied knowing this information (PSAF 97; Defs.' Resp. PSAF 97). Mr. Yee contends that he made this statement in the context of an explanation that he felt "singled out" (vis-a-vis Mr. Apter) because of his age (PSAF 97). UBS does not admit this fact.[22]

---

[22]Mr. Yee offers anecdotal evidence of perceived age animus by Mr. Schrage towards him that spans the period 2003-April 19, 2007, which is disputed. Moreover, while the parties agree that UBS has in place a policy prohibiting discrimination, which Mr. Yee read and received (DSOF 5-6), there is a genuine dispute whether this policy has a complaint reporting requirement (DSOF 6; Pl.'s Resp. to DSOF 6). Nonetheless, Mr. Yee admits that he "learned he could complain about discrimination at UBS, but did not complain about age discrimination to UBS while he was working for Mr. Schrage in Strategy (Def.'s Resp. PSAF 104 (Yee Dep. 167-68; 192-93; Rudin Aff. 6)). Mr. Yee says he did not complain because he was "skeptical about the policy's effectiveness" (Pl.'s Resp. to DSOF 7). We note these matters, but do not find them material to our summary judgment decision.

25

Finally, the parties agree that, at some point, Mr. Yee and Ms. Rudin agreed to meet alone without Mr. Schrage present; and this was the last time Mr. Yee interacted with Mr. Schrage while employed by UBS (DSOF 65). UBS maintains that, once Mr. Schrage was gone, Ms. Rudin asked Mr. Yee if he was certain he could no longer work for Mr. Schrage; and, that Mr. Yee answered affirmatively (DSOF 66). Mr. Yee denies this (Pl.'s Resp. DSOF 66). At the end of the private meeting with Ms. Rudin, the parties agree that Mr. Yee asked her what he should tell Mr. Apter about the meeting. Ms. Rudin told him that he did not have to say anything; instead, she directed him to "just go back to the office and assume business-as-usual" (PSAF 98).

Mr. Yee did as he was told; he returned to his computer and desk in Strategy on the afternoon of April 20, 2007, as reflected by chat emails on a business matter with Mr. Apter from 1:27 p.m.-1:54 p.m. (PSAF 99). However, later that day, Mr. Yee received a phone call from Ms. Rudin telling him that he needed to leave the office until they (Ms. Rudin and Mr. Yee) could meet again to discuss his options for placement elsewhere within UBS (PSAF 99). The parties dispute whether Ms. Rudin escorted Mr. Yee from the building or whether Mr. Yee left on his own (*compare*: PSAF 99 *with* Defs.' Resp. PSAF 99). There are no assertions that Mr. Yee protested. However, UBS claims that, before he left, Mr. Yee printed out the historical snapshots of his PnL from January 2004 to April 2007, which he later produced to UBS in discovery (Defs.' Resp. PSAF 99).

UBS maintains and Mr. Yee admits that no one told Mr. Yee on April 20, 2007 that his "employment" was terminated (DSOF 67).

**E.**

Next, we address the material facts related to the communications and events that affected Mr. Yee and his employment with UBS in the days following April 20, 2007 through July 31, 2007, the last day he was employed by UBS. We begin with the events following the April 20, 2007 meetings. On Monday, April 23, 2007, Mr. Yee sent Ms. Rudin an email stating, "Angela, . . . [the] option that I obviously would prefer the most is for reassignment within UBS" (DSOF 68). On Tuesday, April 24, 2007, Mr. Yee met with Ms. Rudin (PSAF 100). Although Ms. Rudin did not remember this meeting during her deposition (PSAF 100), she later testified that she told Mr. Yee that his three-month paid leave of absence would end in a "mutual separation" if he failed to secure another position within UBS during that time (Defs.' Resp. PSAF 102). Ms. Rudin also told Mr. Yee that he would have full access to his email, voice mail, and intranet, including his electronic research resources, during his paid leave (DSOF 68). Mr. Yee testified that he understood Ms. Rudin's statements to mean that, while he was on paid leave, he would not report to Mr. Schrage and management would help him look for another position within UBS (DSOF 68). Ms. Fitzpatrick did not approve a termination of Mr. Yee prior to April 20, 2007, and she did not personally speak to Mr. Yee about his separation from UBS (DSOF 67; PSAF 103; Def.'s Resp. PSAF 103).[23]

Ms. Rudin "stayed true to her word to help [Mr. Yee] look for another internal position" (DSOF 69). She reviewed and revised Mr.Yee's resume, alerted Mr. Yee to internal position openings within UBS that she thought would be a good fit for him, introduced Mr. Yee to

---

[23]UBS's assertion that Ms. Fitzpatrick did not approve a termination of Mr. Yee on or before April 20, 2007 is not specifically denied by Mr. Yee (Pl.'s Resp. DSOF 67). The asserted fact is therefore deemed admitted.

contact managers for the positions of interest to him, and arranged interviews (DSOF 69). In addition Ms. Rudin enlisted the help and support of a number of other UBS managers in Mr. Yee's job search efforts. For example, Joe Scoby, Chief Executive Officer, recommended Mr. Yee for a number of positions, including a position in China of interest to Mr. Yee (DSOF 70). Kiku Taura, Head of Human Resources for the Americas, also recommended Mr. Yee for a position (DSOF 70). Despite this assistance, Mr. Yee did not find another job at UBS (DSOF 70).

On July 31, 2007, Mr. Yee's paid leave of absence ended. At that point, UBS no longer considered Mr. Yee to be employed with the company.

During the time when Mr. Yee was still looking for a new position within UBS, he received a letter dated May 11, 2007, signed by Mr. Schrage and Ms. Rudin. In the letter, UBS offered Mr. Yee a severance package and informed him that his "mutual termination" date would be July 31, 2007 (PSAF 101). The letter offered Mr. Yee the opportunity to participate in the "UBS Global Asset Management Separation Program" (PSAF 101). Mr. Yee rejected this severance offer (PSAF 102; Def.'s Resp. PSAF 102). According to the summary plan description accompanying the letter, to be eligible for the Separation Program, an employee had to be "selected for involuntary termination"; by contrast, an employee who voluntarily terminated employment would not be eligible for benefits under that program (PSAF 101).

In addition, on June 20, 2007, UBS generated an internal document stating that Mr. Yee's termination resulted from "Job Elimination/Redundancy" (PSAF 105). UBS admits that this document contains that designation, and that Mr. Rudin approved that designation (Defs.' Resp. PSAF 105). But, Ms. Rudin avers that this document was generated "so that [Mr. Yee] could

28

receive the most generous separation benefits available at UBS (DSOF 71, citing Pl.'s Dep. Exs. 35, Rudin Dep. 124-25). Mr. Yee disputes that the coding used would have resulted in a more favorable separation package (Pl.'s Resp. DSOF 71).

On May 17, 2007, Mr. Schrage interviewed and hired Mr. Chris Shibutani (date of birth: 07/12/63), age 43, for an analyst position in the healthcare sector of Strategy (PSAF 106). UBS admits that Mr. Shibutani was under consideration for Mr. Yee's position, as early as April 27, 2007, but no later than May 4, 2007 (PSAF 106). Also, in May 2007, UBS hired Mr. Daniel Matviyenko (date of birth: 08/24/78), who was then 29 years old, as an analyst to take over a small portion of Mr. Yee's former responsibilities on the healthcare portfolio (PSAF 107).[24] However, soon after hire, Mr. Matviyenko's responsibilities as an analyst on the healthcare portfolio were expanded (PSAF 107). Messrs. Matvieynko and Shibutani now divide the healthcare sector between them, and Mr. Apter still trades for that sector (PSAF 108).

In May 2007, Mr. Apter received a promotion to the position of Executive Director (PSAF 116). This is the same title previously held by Mr. Yee, but it is not clear from the record whether Mr. Apter assumed Mr. Yee's actual position. This promotion came despite uncontested facts, which reflect Mr. Schrage's view, that Mr. Apter was not meeting expectations for PnL in 2006 and early 2007.

For example, in late 2006, Mr. Schrage discussed with both Mr. Yee and Mr. Apter the need for both of them to improve their PnL performance and to "make money" (DSOF 51). This view was later reflected in Mr. Apter's 2006 PMM. In the 2006 PMM, Mr. Schrage gave Mr.

---

[24]Shortly after Mr. Yee's separation from Strategy, Mr. Matviyenko began helping Mr. Apter with the book of stocks (DSOF 17), because Mr. Apter testified that he did not feel "comfortable that [his] knowledge could sustain the book [of stocks] (DSOF 17). Mr. Yee did not deny this portion of DSOF 17, nor did he make any response to it. Therefore, we deem admitted this part of DSOF 17, since it is supported by deposition testimony cited by UBS.

Apter an overall rating of "3" to signify that he fully met expectations; but he rated financial performance as a "4" or a below expectations grade (Pl.'s Dep. Exs., Tab 7, Dep. Ex. 17, App. 25, 28). These are the same set of ratings he gave to Mr. Yee in his 2006 PMM (*Id.*, Tab 2). Mr. Schrage also criticized Mr. Apter for the significant losses in the healthcare sector with the same words used to describe Mr. Yee's performance that year: "Profitability. Make Money. Each person has an impact at the Sector/Sub-sector level of the portfolio" (Pl.'s Dep. Exs., Tab 7, Dep. Ex. 17, App. 25).[25] Despite these ratings and comments, Mr. Apter, nevertheless, received a larger bonus than Mr. Yee for 2006 (PSAF 116).

Mr. Schrage continued to criticize both Mr. Apter and Mr. Yee in early 2007 (DSOF 55). In a February 26, 2007 email to both men, Mr. Schrage called out early losses in the portfolio totaling nearly $13 million between January and February 26, 2007 (DSOF 54).

This, however, is where the facts related to Mr. Apter's accountability for the healthcare portfolio losses in 2007 stops in the record. Even though the portfolio lost another $4.3 million between mid-February and mid-April 2007, bringing the total loss for 2007 to just under $17 million (DSOF 56), there is no evidence that Mr. Apter was held accountable in any way by Mr. Schrage or anyone else at UBS for early losses to the healthcare portfolio. For example, he was not placed on a PIP or probation; he was not offered a leave of absence to look for another job within UBS; and, he was not offered a severance package to voluntarily leave UBS (PSAF 116). In short, he did not suffer adverse treatment in any way for his participation on the healthcare

---

[25]From 2005-2007 Mr. Apter also acted as a trader for Shannon Curley (age 42 in 2007) on the insurance portfolio in Strategy. This portfolio also suffered losses from 2005-06 (PSAF 115), but UBS denies that these losses were "as severe" as those in the healthcare sector (Defs.' Resp. PSAF 115). The parties do not assert (and the 2006 PMM is not clear) what if any comments or ratings related to Mr. Apter's performance applied to his work for Ms. Curley.

portfolio for 2006 and early 2007. Indeed, as noted, Mr. Apter actually received a promotion to Executive Director in May 2007, as well as a raise to his base salary at the end of 2007 (PSAF 116).

F.

Finally, we address the issue of what Mr. Yee did to mitigate any damages he might have suffered following his separation from UBS on July 31, 2007. In July 2007, Mr. Yee began discussions with Segal, Bryant & Hamill ("SBH") about potential employment (DSOF 73). SBH, located across the street from UBS, is an investment management firm (DSOF 73). At the time, SBH wanted to hire a senior healthcare analyst who would be able to identify stocks in the healthcare sector that would appreciate and make money (DSOF 73). Mr. Yee's discussions with SBH progressed to personal interviews on July 25, 2007 with Phillip Hildebrandt, the Chief Executive Officer of SBH (DSOF 74). Mr. Hildebrandt told Mr. Yee that he would be able to offer him a base salary of $200,000, which was $50,000 more than Mr. Yee's base salary at UBS, and a bonus of up to 200,000, which was $50,000 more than Mr. Yee's last bonus at UBS (DSOF 74).

However, Mr. Hildebrandt told Mr. Yee that at SBH there would be a cap on earnings at $400,000 annually ($200,000 base and no more than a $200,000 bonus) (PSAF 119). The two men who replaced Mr. Yee at UBS made more than $400,000 annually in 2008 (Sibutani $690,000; and Matviyenko $1.7 million). Mr. Hildebrandt from SBH testified that his company could not match these figures (PSAF 119). In addition, UBS offered analysts stock options; SBH did not offer options because SBH was a partnership, and it did not offer equity shares to employees (PSAF 118). The last difference between the two jobs noted by the parties is that

31

SBH offered Mr. Yee an analyst position without the responsibilities for managing a portfolio (PSAF 117).

The parties dispute whether SBH made Mr. Yee an offer of employment for this job. An email from Mr. Yee stated that he understood SBH to have made "a verbal offer of employment" to him (DSOF 77). Mr. Yee, however, later testified in his deposition that he did not receive an offer; and this email "turned out to be erroneous and premature" (PSAF 117).

As of August 9, 2007, Mr. Yee called Mr. Hildebrandt to terminate discussions regarding employment with SBH. Mr. Yee testified that he did not pursue employment with SBH, in part, because SBH could not offer him "equity participation" in the company (*compare* DSOF 79 *with* PSAF 118). Mr. Yee also testified that, after the August 9 telephone call with Mr. Hildebrandt, he sent Mr. Ralph Segall, one of the name partners of SBH, an email thanking him for his time and stating that he had "decided not to proceed with the health care analyst position," principally because of the "partnership" issue (DSOF 80).

During the time Mr. Yee was discussing employment with SBH (in July 2007), he also had discussions regarding employment with Leerink Swann in Boston (PSAF 120). Those discussions did not progress to an offer of employment (Def.'s Resp. to PSAF 120).

**IV.**

We now proceed to an analysis of the parties' arguments. A plaintiff can prove a claim of discrimination directly or indirectly. Mr. Yee has chosen to assert his claim of age discrimination using the indirect method.

The indirect method was established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); it provides a phased method for offering the circumstantial

32

evidence required to prove discrimination under various civil rights statutes, such as the ADEA. To survive summary judgment under the ADEA, *McDonnell Douglas* requires Mr. Yee to first establish a *prima facie* case of age discrimination with evidence sufficient to establish, or, at least, create a triable issue on four facts: (1) that plaintiff is in the protected class (age 40 or over); (2) that plaintiff was meeting the legitimate expectations of the employer; (3) that despite this performance, plaintiff was subjected to an adverse employment action; and (4) in a case where termination is the adverse action, that plaintiff was replaced by a person or persons who were substantially younger but who had similar qualifications. *See, e.g., Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133 (2000). A plaintiff who makes a *prima facie* case has offered evidence sufficient to create an "inference" of age discrimination.

The burden then shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse action taken against the plaintiff. *Reeves,* 530 U.S. at 142-43. This burden is one of production and not one of proof. *Id.* That said, the defendant fails to meet this burden, then summary judgment must be denied. *O'Connor v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 311 (1996).

If properly asserted, the legitimate, non-discriminatory reason becomes the focal point for the plaintiff's case against the defendant. The plaintiff then must to offer evidence sufficient to persuade the trier of fact that the asserted reason is a "pretext" for discrimination, and that the real reason for the complained of act was discrimination. *Reeves,* 530 U.S. at 143-48.

UBS raises threshold issues concerning whether the *McDonnell Douglas* burden shifting approach applies to ADEA cases and, if it does, what a plaintiff must show to satisfy the fourth element of the *prima facie* case. We address each of these issues in turn.

33

**A.**

In *Gross v. FBL Financial Services, Inc.,* 129 S. Ct. 2343 (2009), the Supreme Court held that an ADEA plaintiff asserting wrongful termination bears the burden of proving that, "but for" age, he or she would not have been terminated. On summary judgment, of course, a plaintiff need only offer evidence sufficient to create a genuine issue of material fact on this issue. At trial, a plaintiff must prove this point by a preponderance of the evidence.

UBS claims the Supreme Court did more than that in *Gross,* and held that the burden-shifting paradigm established by *McDonnell Douglas* is *"inapplicable* to the ADEA" (Defs.' Mem. at 4) (emphasis in original). We disagree. In fact, defendants' contention is belied by the express statement in *Gross* that the Supreme Court "has not definitively decided whether the evidentiary framework of *McDonnell Douglas Corp. v. Green* . . . utilized in Title VII cases is appropriate in the ADEA context." 129 S. Ct. at 2349 n.2 (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142 (2000) and *O'Connor v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 311 (1996)). There is no basis in *Gross* to find that the Supreme Court decided *sub silentio* a question that was not presented in the case, especially since the Supreme Court acknowledged in *Gross* (and, for that matter, in *Reeves* and *O'Connor*) that it had not yet resolved the issue. To be sure, the Supreme Court in *Gross* clearly held that in ADEA cases a plaintiff must prove that discrimination was "the" reason for the adverse action to prevail. But, *Gross* did not equate the burden of proof in an ADEA case with the method of presenting that proof.

That said, even if we read *Gross* as foreshadowing the demise of the *McDonnell Douglas* framework in ADEA cases, this Court still would not be at liberty to act based on such a prediction. In the absence of governing Supreme Court precedent on this question,

34

Seventh Circuit authority controls. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997) (lower courts must leave to the Supreme Court "the prerogative of overruling its own decisions"). The Seventh Circuit has held that the *McDonnell Douglas* framework applies to ADEA cases, both in decisions that predate *Gross, see, e.g., Duncan v. Fleetwood Motor Homes of Ind., Inc.,* 518 F.3d 486, 490-91 (7th Cir. 2008); *Kaniff v. Allstate Ins. Co.*, 121 F.3d 258, 263, (7th Cir. 1997), and in cases decided after *Gross. See, e.g., Senske v. Sybase, Inc.,* 588 F.3d 501, (7th Cir. 2009); *Martino v. MCI Communications Services, Inc.*, 574 F.3d 447, 453 (7th Cir. 2009). We therefore will apply the *McDonnell Douglas* framework to the evidence offered in the summary judgment papers.

## B.

The second threshold issue concerns what a plaintiff must show to establish the fourth element of a *prima facie* case of age discrimination. Mr. Yee argues that he may satisfy the fourth element by offering evidence that he was replaced by substantially younger individuals who were no more qualified than he was for the same job (Pl.'s Mem. at 10). UBS argues that Mr. Yee's attempt to satisfy the fourth element in this fashion "misses the mark by a wide margin" (Defs.' Reply at 11). UBS argues that to satisfy the fourth element, Mr. Yee must offer evidence that he was treated less favorably than all similarly situated younger persons (Defs.' Mem. at 12-14; Defs.' Reply at 11-13). For the reasons that follow, we conclude that plaintiff has the better of this argument.

The majority of Seventh Circuit cases state that in a termination case, such as the one at bar, a plaintiff may meet the fourth element of the *prima facie* case by showing he was replaced by a substantially younger person. *See, e.g., Duncan v. Fleetwood Motor Homes of Ind., Inc.,*

35

518 F.3d 486 (7th Cir. 2008); *Olson v. N. FS, Inc.,* 387 F.3d 632 (7th Cir. 2004); *Richter v. Hook-Superx, Inc.,* 142 F.3d 1024 (7th Cir. 1998). *See generally Pantoja v. Am. NTN Bearing Mfg.,* 495 F.3d 840, 845-46 (7th Cir. 2007) (in a Title VII case explaining how the *prima facie* case of discrimination has evolved regarding the fourth element in cases where the adverse action at issue is employee termination). The Supreme Court has also held that the fourth element may be satisfied by evidence that the person or people who replaced the plaintiff were "substantially younger" and no more qualified. *See, e.g., Reeves,* 530 U.S. at 142. And, in holding that the fourth element cannot be met merely with proof that the replacement was outside the age group protected by the ADEA, the Supreme Court in *O'Connor* explained that "the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class." 517 U.S. at 313.

In line with *O'Connor,* the Seventh Circuit has focused not on whether a replacement was outside the protected age group, but on whether the replacement was "substantially younger" than the plaintiff. The Seventh Circuit has used a ten-year differential as a rough benchmark of the age discrepancy sufficient to satisfy the "substantially younger" requirement of the fourth element in the *prima facie* case. *See Duncan,* 518 F.3d at 490-91, 493 (fourth element met because employer sought replacement younger to perform same work after plaintiff left); *Olson,* 387 F.3d at 635-36 (fourth element met when employee in protected class was discharged and replaced by someone younger, and he could show "he was performing his job to the employer's legitimate expectations"); *Richter,* 142 F.3d at 1028-29 (defining "substantially younger" as at least a 10-year difference).

Notwithstanding these authorities, UBS argues that, for purposes of the fourth element, the proper inquiry is whether "similarly situated, younger employees were treated more favorably than" Mr. Yee; and, for purposes of that inquiry, this Court is required to consider not only Mr. Yee's replacements, but also a broader group of employees, specifically, the other analysts within the Strategy (Defs.' Mem. at 12-13; Defs.' Reply at 11-13). In aid of its argument, UBS cites *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633 (7th Cir. 2008), in which the Seventh Circuit articulated the fourth element as requiring evidence that "similarly situated employees outside [the] protected class [were treated] more favorably." *Id.* at 641.

The UBS misreads *Faas* as holding that this is the only way to establish the fourth element of a *prima facie* case. UBS's interpretation would ignore the admonition against "an unduly rigid approach" when using the *McDonnell Douglas* framework. *Pantoja*, 495 F.3d at 845-46. Although *Pantoja* was a Title VII, rather than an ADEA case, its admonition is true for all cases where *McDonnell Douglas* is applied. The *McDonnell Douglas* framework is a judicially-created tool for assessing the strength and weakness of a plaintiff's evidence on summary judgment. Some cases may lend themselves to proof of the fourth element by reference other allegedly similarly situated employees; but, some may not. *Faas* may have been a case in which comparison to all other similarly situated employees would shed the most light on the contested issues. In *Faas*, there is no discussion about who replaced the plaintiff or of that person's age; perhaps the absence of such discussion means there was no replacement. *Faas*, however, does not create a straightjacket that bars a plaintiff from proving the fourth element by offering evidence that he was replaced by a substantially younger person; that much

37

is clear from the Supreme Court's decisions in *Reeves* and *O'Connor*, as well as Seventh Circuit decisions such as *Duncan, Olson* and *Richter*.

That is the path that plaintiff has chosen here, and we see no legal impediment to his pursuit of that path. Therefore, in considering whether plaintiff has established the fourth element of his *prima facie* case, we will look to the age of his replacements.

## C.

With those preliminary issues settled, we now move to Mr. Yee's *prima facie* case. To defeat UBS's motion for summary judgment, Mr. Yee must demonstrate either that he has proven each element of the *prima facie* case or that there is a triable jury issue on those elements he has not established. There is no dispute that Mr. Yee has satisfied the first element of the *prima facie* case: Mr. Yee was 54 years old at the time of all relevant actions (DSOF 1), and is a member of the protected class. We thus focus on the evidence concerning the remaining elements of the *prima facie* case, which we address in turn.

### 1.

The second element of the *prima facie* case requires evidence that Mr. Yee was meeting the legitimate expectations of UBS at all relevant times. The evidentiary record on this issue presents undisputed facts, as well as genuine disputes for trial.

The parties do not contest that Mr. Yee's 2006 PMM, issued by Mr. Schrage in late January 2007, reflects an overall rating of "3" or "fully met" expectations, despite a rating of "4" or "partially met" expectations in the category of "financials" or PnL, for which he was given a bonus of $150,000, in addition to his regular salary of $150,000, for his performance. Additionally, despite lower ratings for PnL, the record shows that Mr. Schrage and Ms.

38

Fitzpatrick considered Mr. Yee's performance in this area to be correctable. Ms. Fitzpatrick testified that she and Mr. Schrage considered Mr. Yee for a PIP, not termination, in early 2007; and the offer of probation by Mr. Schrage and Ms. Rudin underscores that intent (PSAF 96-97; Defs.' Resp. PSAF 16).

Moreover, using 2006 as a metric, Mr. Yee's PnL performance improved significantly in the back half of 2006, beginning in May; in fact, a deficit of nearly $12 million was erased during the second half of the year, albeit on a "smaller book." This fact was recognized by UBS in the marketing materials distributed to investors to explain the residual loss of approximately $5 million. There, it was stated that losses in health care were due in part to an overall decline in the sector in the general economy (PSAF ¶ 91). Mr. Schrage noted these facts in Mr. Yee's 2006 PMM as well. A reasonable jury could infer that the losses to the healthcare portfolio were not entirely attributable to Mr. Yee's performance. Taking these facts in the light most favorable to Mr. Yee, as we must do when considering summary judgment, we conclude that a reasonable jury could conclude that Mr. Yee met UBS's expectations for the 2006 calendar year.

The same is true for the first quarter of 2007, although the question is a much closer one. UBS concedes, for purposes of summary judgment, that the lion's share of loss to the healthcare portfolio between January and April 20, 2007, approximately $13 million, had occurred by February 26, 2007, even though the portfolio lost approximately another $4 million between February 26 and April 20, 2007. In the face of such large losses, the evidence that supports Mr. Yee's position that he was still meeting legitimate expectations in early 2007 is sufficient to raise a triable issue on this question.

In his 2006 PMM, Mr. Apter received the same performance ratings as did Mr. Yee: an overall rating of "3" and a rating of "4" for "financials" or PnL. The comments about Mr. Apter's performance were, word for word, the same as those used to describe Mr. Yee's performance. Similarly, from January through February 26, 2007, the undisputed evidence is that both men were subject to criticism and ultimatums regarding the need to make money. In addition, the undisputed evidence is that Mr. Apter's performance on the healthcare portfolio was criticized in tandem with Mr. Yee's performance on the same portfolio as late as February 26, 2007 – the point at which the healthcare portfolio had lost nearly $13 million.

From January 1, 2007 through April 20, 2007 – Mr. Yee's last day in Strategy – Mr. Apter remained Mr. Yee's trading partner on the healthcare portfolio. Mr. Apter, however, was not separated from his job on the healthcare portfolio; he was not placed on, or threatened with, "an official and messy" probation/PIP or severance; and, he was not offered a paid leave of absence to look for another job within UBS. To the contrary, in May 2007, shortly after Mr. Yee's separation from Strategy, Mr. Apter received a promotion to the position of Executive Director within Strategy, as well as a raise to his base salary. These facts raise the question whether Mr. Yee was meeting UBS's legitimate expectations. Mr. Apter's performance on the same portfolio that was bleeding money in early 2007 mimics that of Mr. Yee at all relevant times. Mr. Apter, however, was not reprimanded after February 26, 2007. Instead, he was subsequently rewarded for his efforts. There is a dissonance between the facts related to Mr. Yee and Mr. Apter that is sufficient to raise a reasonable inference that Mr. Yee, despite the early losses of 2007, may have still been meeting the legitimate expectations of UBS.

UBS counters that Mr. Yee was held more accountable than Mr. Apter for performance on the health care portfolio in early 2007 because he was the analyst and Mr. Apter was simply a trader who followed Mr. Yee's directions. A jury could accept that explanation. Likewise, a jury reasonably could find that enough was enough, and that the level of continued losses rendered Mr. Yee's performance unacceptable.

On a motion for summary judgment, it is not within the Court's province to sort out the competing inferences to be drawn from the facts. We decline to do so here. We conclude only that there is enough evidence to allow a jury to find that Mr. Yee was meeting the legitimate expectations of UBS at all relevant times. Thus, Mr. Yee has satisfied the second element of the *prima facie* case.

## 2.

The third element of Mr. Yee's *prima facie case* requires him to provide evidence from which a reasonable fact-finder could find that, despite his satisfactory performance, Mr. Yee suffered an "adverse action." In this case, Mr. Yee alleges that the adverse action was termination. UBS denies that it terminated Mr. Yee, contending that he resigned instead. On this point, we have dueling deposition testimony with no contemporaneous notes to confirm either side's position.

For example, UBS asserts that Mr. Yee "effectively resigned" as of April 20, 2007 (Defs.' Mem. at 3). This assertion is based on UBS's statement that Ms. Rudin and Mr. Schrage "believed" that Mr. Yee stated a categorical refusal to work any longer for Mr. Schrage within Strategy. UBS contends that Mr. Yee's statements could be interpreted in no other reasonable way than as a resignation of his position. Mr. Yee emphatically disagrees, asserting that he did

not refuse to work for Mr. Schrage (Pl.'s Mem. at 3-4; Pl.'s Resp. DSOF 65), but rather stated a preference to look for work outside Strategy but within UBS (Pl.'s Mem. at 4). Indeed, Mr. Yee said that he merely stated a "preference" to look for another job within UBS "before accepting any final action" on his current job (PSAF 96). UBS unconditionally admitted this statement was made during the initial meeting between Messrs. Yee and Schrage on April 20, 2007 (Defs.' Resp. PSAF 96). What is disputed is whether this was still Mr. Yee's position by the time he met with Ms. Rudin and Mr. Yee during the afternoon meeting on April 20, 2007; and, specifically, whether this was Mr. Yee's position when he met singly with Ms. Rudin after Mr. Schrage had been asked to leave. Ms. Rudin unequivocally testified that she confirmed that Mr. Yee refused to work for Mr. Schrage at this time. Mr. Yee testified that he was not asked this question nor did he make such a statement. This is a swearing contest suitable for resolution only at trial.

Additionally, the parties dispute whether Mr. Yee refused to accept probation and/or a PIP for his job within Strategy. Although UBS argues that Mr. Yee's refusal to work with Mr. Schrage made the option of probation a "practical impossibility" (Defs.' Mem. at 9), the offer of probation is a moot point only if a fact-finder concludes that Mr. Yee did in fact state a refusal to work for Mr. Schrage on or after April 20, 2007. If, in fact, Mr. Yee only stated a "preference" not to work with Mr. Schrage, then Mr. Yee's undisputed request earlier in the day that Mr. Schrage refrain from taking "any final action" with respect to his job would permit a reasonable jury to find that Mr. Yee was not closing to door to working with Mr. Schrage, and accepting probation and/or a PIP, if he could not find work elsewhere in the company.

An email, dated April 23, 2007, from Mr. Yee to Ms. Rudin, confirms a meeting on April 24, 2007 to discuss Mr. Yee's future employment with UBS. In this email, Mr. Yee states his

preference for "reassignment within UBS." This statement confirms that Mr. Yee believed that
he was still assigned to Strategy and that he had options as of this date (DSOF 68). Moreover,
Mr. Yee testified that, after the meeting with Ms. Rudin on April 24, 2007, he believed that Ms.
Rudin and UBS would help him find a job internally.

Moreover, there is no dispute that at the April 20 meetings, no one told Mr. Yee he
would be not be allowed to remain employed at UBS if he failed to find a position by July 31,
2007. UBS asserts that Ms. Rudin told Mr. Yee he would be placed on paid leave through July
2007 at the April 24 meeting (DSOF 68; Pl.'s Resp. DSOF 68). Mr. Yee admits that Ms. Rudin
told him that his paid leave would end in July 2007, but he asserts that UBS did not notify him
that this meant he was terminated at that meeting or before (PSAF 102). UBS disputes this
assertion, stating that Ms. Rudin's notification that his paid leave would end in July 2007 was
tantamount to notification of termination (Defs.' Resp. PSAF 102). The Court finds this dispute
to be genuine and material. Notification of the end of a paid leave is not the same as notification
that "if he did not find another opportunity at UBS during his paid leave, his employment would
come to an end when the leave ended" (*Id.*). This quoted statement, taken from UBS's LR
56.1(b)(3)(c) Response to Mr. Yee's asserted facts, is a gloss on the statement that Mr. Yee
admitted, namely, that he was told that his paid leave would end in July 2007. The trier of fact
must determine what inference to draw from this fact at trial.

Ms. Rudin did not put a July 31, 2007 termination date into writing until a May 11, 2007
letter, which offered Mr. Yee a severance proposal. This proposal included salary through the
end of 2007, which was an offer consistent with Mr. Schrage's original verbal offer to Mr. Yee
on April 20, 2007. This severance proposal, however, was made available by UBS only to those

43

who were "involuntarily terminated" and not to those who resigned. UBS asserts that this package was offered to Mr. Yee, not because he had been fired, but because it was more generous than the package offered to those who voluntarily resigned by mutual agreement. That might be the case; recall that Mr. Yee characterized the $150,000 bonus after suffering substantial trading losses in 2006 as "charity money." However, a jury is not required to accept UBS's explanation; a jury could reasonably find that UBS offered Mr. Yee the involuntary termination package because UBS involuntarily terminated him.

Moreover, in deciding what occurred at the April 20 meetings, a jury might consider that Mr. Yee asked Ms. Rudin to refrain from making any final decisions about probation and/or severance on his current job at the same time he asked for a chance to find another job within UBS. Such statements are consistent with a request that he be allowed to hold onto his current job while he looked for another one without having to suffer an adverse actions.

However, if UBS is believed, Mr. Yee asked for a chance to refrain from making a final decision regarding probation or severance earlier in the day, but then, only a short time later the same day, agreed to relinquish his job to accept a paid leave of absence with a definite three-month termination date. Perhaps a jury would find that such a sudden change of heart makes no sense in light of the fact that, earlier that day, Mr. Schrage had offered Mr. Yee as much as a twelve month severance package to look for another job, albeit outside UBS. Conversely, perhaps a jury would find that Mr. Yee considered his relationship with Mr. Schrage ruptured beyond repair and, feeling confident in his ability to land elsewhere within UBS, was willing to jump from Strategy without knowing exactly where he would land.

44

The evidence of whether Mr. Yee was terminated is both disputed in important respects, and subject to conflicting interpretations in other respects. We are not at liberty on summary judgment to resolve the factual disputes or to pick and choose among the parties' conflicting interpretations of the evidence. Plaintiff has offered enough to meet the third element of the *prima facie* case.

### 3.

Finally, the fourth element of the *prima facie* case requires Mr. Yee to produce evidence that the persons hired to replace him in his position as analyst for the healthcare portfolio in Strategy were similarly situated and were substantially younger. UBS does not genuinely dispute that the two men hired to replace Mr. Yee were substantially younger. Instead, because UBS takes the position that the proper focus of the fourth element is not on the replacements but rather on all analysts within Strategy, UBS focuses its argument on whether any of those analysts had the same track record of losses that Mr. Yee accumulated during the relevant time period. UBS asserts, citing facts that have not been admitted, that none of them performed as badly as plaintiff (Defs.' Reply at 12). We have rejected UBS's legal position on the proper focus of the fourth factor of the *prima facie* case; thus, we focus only on the whether Mr. Yee's replacements were similarly situated to Mr. Yee.[26]

Because there is no dispute that the two analysts hired to replace Mr. Yee were substantially younger, the issue is whether Mr. Yee's replacements had better qualifications or

---

[26]UBS's argument that Mr. Apter "does not make a proper comparison" to Mr. Yee and is not similarly situated (Defs.' Mem. at 12-13; Defs.' Reply at 12) is irrelevant. Mr. Yee does not contend that Mr. Apter is similarly situated for purposes of proving the fourth element.

performance records than Mr. Yee; if all else except age were equal and he was meeting UBS's legitimate expectations, then a trier of fact would be permitted to draw the inference that Mr. Yee was replaced because of his age. *See, e.g., Pantoja v. Am. NTN Bearing Mfg. Corp.,* 495 F.3d at 846-47. UBS argues that "similarly situated" employees must be "comparable to the [p]laintiff *in all material respects,* including performance, qualifications and conduct" (Defs.' Reply at 11, citing *Peele v. Country Mutual Ins. Co.,* 288 F.3d 319, 330 (7th Cir. 2002) (emphasis in original)). UBS argues that similarly situated employees are generally "subject to the same standards" and engage in "similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them" (*Id.*, quoting *Radue v. Kimberly Clark Corp.,* 219 F.3d 612, 617-18 (7th Cir. 2000)).

However, neither party has offered the qualifications of Mr. Shibutani or Mr. Matviyenko in terms of education, prior work history, performance review ratings, *etc.* In terms of performance, the parties focus on non-material facts such as the PnL performance of these two men on the healthcare portfolio *after* they were hired as replacements for Mr. Yee (*see, e.g.,* DSOF 72; PSAF 90; Defs.' Resp. PSAF 90). How these two men performed after Mr. Yee was replaced tells us nothing about whether they were "similarly situated" to Mr. Yee at the time they were hired to replace him.

We recognize that the summary exhibits submitted by UBS, which have been deemed "moot" for purposes of summary judgment, contain PnL information for all the analysts within the Strategy prior to April 19, 2007. The PnL performance of the two replacements, however, has not been asserted by UBS in its Local Rule 56.1 Statement; and, UBS has not argued that this evidence should be considered for the specific purpose of finding Messrs. Shibutani and

Matviyenko similarly situated to Mr. Yee. When we take into consideration the admonition to view all evidence in the light most favorable to plaintiff, we find that the fourth element is satisfied.

**D.**

As we have explained, plaintiff has offered evidence that establishes – or at least creates a triable issue – on each element of the *prima facie* case. Under the *McDonnell Douglas* framework, the burden of articulation thus shifts to UBS to offer a legitimate non-discriminatory reason for its actions.

In its opening memorandum in support of its motion for summary judgment, UBS did not assert a legitimate, non-discriminatory reason for terminating Mr. Yee (*see* Defs.' Mem. at 2-14). Instead, UBS took the position that there was no adverse employment action taken against Mr. Yee because Mr. Yee voluntarily resigned (*Id.* at 3). In fact, the LR 56.1 statement submitted by UBS is replete with asserted facts and evidence aimed at establishing that Mr. Yee resigned, and that UBS did not terminate him on April 20, 2007.

However, in the last two paragraphs of its reply brief, UBS asserts Mr. Yee's PnL performance as the "legitimate non-discriminatory reason for his alleged termination" and argues that Mr. Yee cannot establish pretext (Defs.' Reply at 13). UBS then argues that the evidence of "legitimate expectations" and pretext is closely intertwined and "may be merged and considered together" by a court (*Id.*, citing *Faas*, 532 F.3d at 642).

It is true that courts have recognized that the second element of the *prima facie* case, namely, whether a plaintiff has met the employer's legitimate expectations, often elides with an employer's proffered legitimate non-discriminatory reason for acting: the employee's alleged

poor performance. *Senske v. Sybase, Inc.,* 588 F.3d 501, 506 (7th Cir. 2009). However, in this case, UBS is bound to its initial argument that it did not terminate Mr. Yee. Although it could have made this assertion in its opening brief as an alternative argument, it chose not to do so.

Arguments not raised by the parties in the opening brief in support of a motion for summary judgment are waived in the reply brief. *See Commonwealth Edison v. U.S. Nuclear Regulatory Comm'n,* 830 F.2d 610, 621 n.7 (7th Cir. 1987). *See also Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands Intern. Inc.,* 616 F. Supp.2d 805, 831 (N.D. Ill. 2009); *In re Sulfuric Acid Antitrust Litigation,* 231 F.R.D. 320, 329 (N.D. Ill. 2005). Because Mr. Yee has presented genuine issues of material fact on his *prima facie* case, and UBS has failed to satisfy its burden of production by waiver, summary judgment is denied. *See, e.g., St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510 n.3 (1993).[27]

## V.

We address one final issue raised by UBS concerning damages. UBS argues that Mr. Yee had a duty to mitigate his damages but he failed to do so, thereby cutting off his ability to recover any damages (Defs.' Mem. at 14, citing *Hunter v. Allis-Chalmers Corp.,* 797 F.2d 1417, 1428 (7th Cir. 1986)). Failure to mitigate is an affirmative defense which a defendant must prove (Pl.'s Resp. at 14, citing *Gaffney v. Riverboat Servs. of Indiana, Inc.,* 451 F.3d 424, 460 (7th Cir. 2006)). Under the ADEA, a plaintiff who is terminated or discharged has an ongoing duty to undertake reasonable and diligent efforts to secure comparable employment. *See Hunter,* 797 F.2d at 1427. Comparable employment is measured by whether the salary and

---

[27]We note that, even had UBS raised an alternative argument of poor performance as the reason for terminating Mr. Yee, the disputed and material facts would create a triable issue on whether that was the real reason for UBS's actions.

responsibilities of the job are similar or comparable. *See Meyer v. United Airlines*, 950 F.Supp. 874, 876 (N.D. Ill 1997). If a plaintiff receives but refuses an offer for a comparable position, then the plaintiff cannot recover damages from the former employer. *Id.* A plaintiff's personal reasons for rejecting the offer are irrelevant. *Id.*

UBS argues that Mr. Yee failed to mitigate his damages in or around August 2007 when he "received and rejected a comparable offer of employment from [SBH]" (Def.'s Mem. at 15). UBS contends that the SBH offer was for "the same position as the position [p]laintiff held at UBS: a senior healthcare analyst" (*Id.*). UBS further argues that Mr. Yee would also have received a "comparable salary and bonus" (*Id.*). According to UBS, Mr. Yee's failure to mitigate his damages cuts off his ability to recover damages (*Id.*).

Mr. Yee argues that summary judgment on this issue of mitigation is not appropriate, because there are disputes of material fact about whether SBH made an offer to Mr. Yee; and, if so, whether any such offer was for "comparable employment" (Pl.'s Resp. at 14-15). For the following reasons, we agree with Mr. Yee on both scores.

*First*, there is a genuine dispute about whether Mr. Yee received an offer. The testimony of Mr. Hildebrandt suggests that an offer was made, and Mr. Yee's August 3, 2007 email that SBH made a "verbal offer of employment" is an admission that such an offer was made. *See* Federal Rule of Evidence 801(d)(2)(A). However, that admission is evidentiary and not judicial. Judicial admissions "are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding on the part of the party making them. They may not be controverted at trial or on appeal." *Bianco v. Hultsteg AB*, No. 05 C 538, 2009 WL 347002, *12 (N.D. Ill. Feb. 5, 2009) (quoting *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995)). By contrast,

49

evidentiary admissions "do not remove a particular fact from contention, rather, those admissions constitute evidence that, along with all the other evidence, may be considered in determining a fact in dispute." *Id.* The August 3 email plainly falls within the category of an evidentiary admission; it does not bar Mr. Yee from offering contrary evidence concerning whether an offer was made. That is precisely what Mr. Yee he did in his deposition when he said that the statement in his email was erroneous and premature (PSAF 117). A jury certainly may view Mr. Yee's contemporaneous statement to be more credible than his deposition testimony offered several years later and in the midst of this litigation. However, UBS has not explained why a jury would legally be required to reject Mr. Yee's explanation (or recantation) in his deposition. Thus, whether Mr. Yee received an offer from SBH involves questions of credibility that the Court may not resolve on summary judgement.

*Second,* there are genuine disputes of material fact on the question of whether an offer, if made by SBH, was for employment comparable to the position held by Mr. Yee at UBS. Mr. Yee testified that the compensation package offered by SBH was not equal to that of UBS, because the bonus structure was capped at $200,000, and there were no stock options or any opportunity for partnership at SBH. Mr. Hildebrandt from SBH also testified that he did not believe that the compensation package offered by his firm was comparable to the one offered by UBS. On the other hand, the base salary at SBH was $200,000; whereas, the base salary at UBS for Mr. Yee was only $150,000. There is also evidence that, in some years, Mr. Yee failed to make more than a $200,000 bonus.

And, there is disagreement over whether the analyst position at SBH was comparable to the analyst position at UBS in terms of the actual responsibility that Mr. Yee would have had.

50

Mr. Yee testified that the responsibility level at SBH would have been less, because he would not have been managing his own portfolio. But, UBS points to evidence that the job title was that of a senior analyst, the same title Mr. Yee had at UBS. These genuine fact disputes lead us to deny summary judgment on the affirmative defense of mitigation.

## CONCLUSION

For the foregoing reasons, Mr. Yee's motion to strike (doc. #55) is granted in part and denied in part; and UBS's motion for summary judgment (doc. # 52) is denied. The matter is set for a status hearing on May 18, 2010 at 9:00 a.m. Prior to that hearing, the parties are directed to seriously consider and explore with each other settlement.

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATED: April 23, 2010**